Dr. James Albert CRAMER, Plaintiff,

v.

VIRGINIA COMMONWEALTH UNIVERSITY et al., Defendants.

Civ A. No. 75–0271–R.

United States District Court,
E. D. Virginia,
Richmond Division.

May 28, 1976.

W. H. Cabell Venable, Richmond, Va., Robert P. Geary, Highland Springs, Va., for plaintiff.

Walter H. Ryland, Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

This is a civil rights action for declaratory and injunctive relief brought by the plaintiff, Dr. James Albert Cramer, a white male citizen of the United States and resident of the State of Maryland. Named as defendant herein is the Virginia Commonwealth University (VCU), an incorporated, State supported university of the Commonwealth of Virginia. Also named as defendants in this action are various officials of the University, each of whom is being sued either individually, in his official capacity, or both.

The action arises as a result of the implementation by VCU of an affirmative action

program under which the school sought actively to recruit women for faculty positions in order to compensate for alleged past deficiencies in minority hiring, and to attempt to bring the school's employee hiring practices into accord with prevailing federal guidelines.

Plaintiff contends that the University's attempts to comply with what was thought to be its affirmative action obligation actually resulted in a practice of "reverse discrimination." Plaintiff contends that as a consequence of this inequality of treatment, he was denied the offer of a permanent position for which he was at least as well qualified as the two female applicants who were ultimately hired to fill the positions. Plaintiff concludes that such preferential treatment was in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and constituted a denial of his right to the equal protection of the law as guaranteed under the Fourteenth Amendment. Relief is sought under 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1337, 1343, and 2201.

The matter is presently before the Court on cross motions for summary judgment. Briefs, exhibits and stipulations have been filed, and the matter is now ripe for decision. All facts which are material to the summary judgment motions have been stipulated by the parties.

On 24 September 1965 the President of the United States issued Executive Order 11246, which was amended on 13 October 1967 by Executive Order 11375. These orders were calculated to prohibit invidious discrimination in federal employment practices. On 13 October 1968 sex was added to the list of prohibited bases of discrimination. Subsequent to their issuance these presidential directives were held to be applicable to State universities receiving federal grants or contracting with the federal government. Pursuant to these directives, the Governor of Virginia promulgated Executive Order No. 29 which became effective 1 January 1973. This order formally established a policy of equal employment opportunity which was to govern the employment practices of all governmental agencies within the Commonwealth of Virginia. Pursuant to the Governor's order, the Board of Visitors of VCU promulgated "the Affirmative Action Program of Virginia Commonwealth University" on 15 November 1973.

Sometime prior to the commencement of the Fall term, 1973, plaintiff Cramer was offered a temporary appointment as instructor in the Department of Sociology and Anthropology (Department) at VCU. He accepted the offer and served in the Department through the academic year beginning in September 1973 and ending in June 1974. Plaintiff has a B.S. degree in Criminology and Correction, an M.A. degree in Sociology and Criminal Justice, and a Ph.D. in Sociology. He is an active member of several professional organizations, and has published both articles and book reviews in his field. He was a qualified candidate for permanent employment at VCU and, specifically, for appointment to a vacated permanent faculty position within the Department. This vacancy was one of two within the Department for which plaintiff applied and on which this action is predicated. Plaintiff was told prior to accepting his one year appointment that permanent positions were likely to open and if he wished to apply he would be given consideration with other candidates.

On 7 January 1974 plaintiff received a memorandum from John McGrath, Chairman of the Department and a defendant herein, stating that two positions had become available and that if plaintiff wished to be considered he should so inform the recruitment committee. The recruitment committee was a standing committee within the Department whose function it was to seek out and screen applicants for available positions. The plaintiff gave timely written notice to the recruitment committee of his wish to be considered for one of the two available positions.

Almost a year prior to the filing of plaintiff's application with the recruitment committee, on 9 March 1973, defendant

McGrath had given to the committee a copy of the Governor's Executive Order No. 29. This order was interpreted by some members of the Department as, *inter alia,* requiring a hiring preference for females. The Department, which had direct responsibility for its own hiring policies, had a clearly expressed preference that qualified females and members of other minority groups be considered and hired before white males. This preference was known to the recruitment committee. The defendant McGrath also distributed to the committee the Higher Education Guidelines, issued 1 October 1972 by the Department of Health, Education and Welfare. Despite the foregoing, McGrath accompanied these written guidelines and directives with verbal instructions that the committee was obligated only to recommend the hiring of the best qualified applicant.

The records of the Department reflect that of the 385 applications received by the Department for the two vacant positions during the 1973–74 academic year, 57 were from female applicants and 328 were from male applicants. The availability (as distinguished from applications) of women was estimated from a listing of Ph.D.'s recently awarded which showed that 151 females and 309 males had received doctorates in the field in 1973–74.

The files of the 385 applicants were arranged by the committee in alphabetical order. Once position requirements were established, the committee went through the applications and pulled those which were compatible with those requirements. The applications so selected were then divided into three categories: "females," "minority males," and "white males." Only applicants from the "females" pile received further consideration and only they were interviewed for the two vacant positions.

The first position, requiring a statistical capability, was offered to and accepted by a qualified female whose credentials satisfied the requirements for the position. The second position, requiring a criminology background, was also offered to and accepted by a qualified female who had been interviewed for the first position. A total of four females were interviewed for the first position. The Department chairman had transmitted the recruitment committee recommendations regarding the hiring of the two females to another of the named defendants, Paul Minton, Dean of the School of Arts and Sciences, who communicated the actual offer of employment to the applicants.

It is undisputed that plaintiff Cramer's basic academic credentials, as evidenced by his academic vita, were equal to or exceeded those of the individual hired for at least one of the two positions. Plaintiff has stipulated that the actions of the defendants herein, albeit discriminatory and illegal, were undertaken in good faith and without improper or culpable motive. Plaintiff therefore seeks only equitable and declaratory relief and no damages.

I

Our first inquiry is directed at the issue of whether the preferential hiring of college instructors on the basis of sex was a violation of plaintiff's Fourteenth Amendment right to the equal protection of the laws.

■■■ Under traditional Equal Protection analysis, differential treatment by the State is permissible if it is rationally related to some legitimate governmental interest. *U. S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). However, where the State regulation categorizes persons according to certain immutable characteristics over which those classified have little or no control, the State may have to show a compelling interest to justify its classification. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Supreme Court has determined that classifications based on race, *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), alienage, *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and national origin, *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948), are inherently suspect, thus raising a

strong presumption against their validity. Although the Court has determined by plurality opinion that sex also constitutes a suspect class, *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), the Court's refusal to apply strict judicial scrutiny to a sex-based classification in its recent decision in *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) reflects an apparent disinclination to extend the list of suspect categories beyond its previous boundaries. Absent a controlling decision that sex is an inherently suspect class, this Court must conclude that only a rational basis need be shown in order to justify classifications based on sex. *See, Stanton v. Stanton, supra; Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

Defendants assert that the decision to consider and hire only qualified female candidates to the exclusion of all qualified male applicants, including plaintiff, was rationally related to the interest of VCU in conforming its hiring policies to federal and State affirmative action guidelines. These guidelines, defendants argue, embody ". . . a theory that because some groups may be victims of discrimination, employers should take affirmative action to hire those individuals without regard to whether a partic-

ular individual has been a victim of discrimination or whether a particular employer has engaged in discriminatory practices."

■ However appealing the concept underlying affirmative action may be, defendants' reliance thereon as justification for preferential hiring practices based on sex begs the question of whether such a policy can withstand the challenge that its implementation necessarily violates the Constitution. The Supreme Court and Fourth Circuit have yet to find that the type of affirmative action practiced by defendants herein is a constitutional means of obviating the remnants of past invidious sex discrimination.[1] Plaintiff's challenge to the employment guidelines followed by VCU raises the issue of whether a policy which notoriously favors the hiring of less or equally qualified candidates for competitive positions without considering other equally or better qualified applicants solely on the basis of sex could survive Fourteenth Amendment scrutiny. The Court interprets the Equal Protection clause as requiring that where sex is the sole factor upon which differential treatment is determined, there is no constitutional justification for treating the sexes differently.[2] *Kirstein v. Rector and Visitors of University of Virginia,* 309 F.Supp. 184 (E.D.Va.1970).

The Court can conceive of no rational relationship between gender and suitability

---

1. Dicta in the recent Fourth Circuit Case of *Patterson v. American Tobacco Company,* 535 F.2d 257 (4th Cir. 1976) suggested that racial quotas and preferential hiring may be an appropriate remedy where a long-standing practice of unlawful discrimination has been shown to exist. However, the facts of the instant case do not, in this Court's view, reflect a "compelling need" for so drastic a measure as the imposition of quotas or preferences.

2. Even if the Court were persuaded that correcting an imbalance in the number of female employees at VCU would insure against further invidious sex discrimination in hiring and promotion practices we still could not accept defendants' argument ". . . that benign hiring preferences for minorities [and women] are a proper method of redressing the economic ills of such groups." Preferential hiring, as such, merely camouflages the current symptoms of past sex discrimination, but fails to address the actual causes. The Court can perceive of no

rational relationship between cosmetic remedies employed by VCU which are designed to eradicate unfavorable male-female employee ratios, and the root cause of such an imbalance—a paucity of available female and minority applicants whose credentials are superior to those of the male applicants for similar employment. The ultimate—the only effective solution involves a systematic and persistent policy of recruiting, educating and selecting women who can compete for a given position on an equal basis with any other applicant, male or female, without the need to be favored or afforded a competitive advantage. Favoritism only perpetuates the myth of female inferiority and thus is at cross-purposes with the stated goal of affirmative action policies. *See Erickson, Kahn, Ballard and Wiesenfeld: A New Equal Protection Test in "Reverse" Sex Discrimination Cases?,* 42 Brooklyn L.Rev. 1 (1975).

for being hired in this case as an instructor at VCU. Defendants do not attempt to argue that such is the case. Furthermore, no Supreme Court decision allowing State imposed disparities of treatment based on sex have approved discrimination *against* one sex *in favor* of another. *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974); *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

The conclusion the Court draws is that where the only difference between two persons competing for the same job is a difference in sex, then the Equal Protection Clause requires that they not be treated differently on account of the fact that one is male and the other is female. *Stanton v. Stanton, supra; Weinberger v. Wiesenfeld, supra; Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

## II

▮ Plaintiff's second challenge to the employment practices of VCU requires us to determine whether affording preferential treatment on account of sex constitutes a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* In pertinent part, 42 U.S.C. § 2000e–2(a) provides:

.    .    .    .    .

(a) *Employers.* It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

It has been stipulated that VCU qualifies as an employer so as to come within the scope of Title VII and its proscription against hiring preferences based on sex.

The clear and encompassing language of 42 U.S.C. § 2000e–2(a)(1) and (2), read without any attempt to enhance or detract from its meaning, prohibits employment practices which, *inter alia,* predicate hiring and promotion decisions on gender-based criteria. Likewise, the language of 42 U.S.C. § 2000e–2(j) is unequivocal as to its stated purpose—to reflect the intention that Title VII not be interpreted to require the granting of preferential treatment by employers on the basis of enumerated considerations, including sex, which have no relationship to one's employment capability. The provisions of Subsection (j) reads as follows:

(j) *Preferential treatment not required on account of numerical or percentage imbalance.* Nothing contained in this title [42 U.S.C. §§ 2000e–2000e–17] shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this title to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by an employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

Defendants admit in the opening paragraphs of their brief that they discriminated against plaintiff on the basis of sex, but

they attempt to excuse this conduct because they were undertaking "to fulfill the national and State policy of affirmatively seeking women and minority employees as a device to eliminate the effects of past discrimination against these groups."

Nothing appears in the record to indicate that there has been any "past discrimination" against women at VCU, but the Court will accept that it would be a most unusual case if such were not true. Further, there is nothing to indicate that the "effects" of past discrimination against women still persist at VCU. But the Court will accept that as a fact also, though the continuing existence of the effects of past discrimination is far from self-evident in many cases.

However, even assuming an "imbalance" such as that contemplated by subsection (j) which would trigger the affirmative action imperative that sex be given paramount consideration to correct the imbalance, subsection (j) is the clear sense of Congress that it not be corrected by sex preference, or quotas, or, to use the current pseudonym, "goals."

The Court is mindful of language in the recent Fourth Circuit case of *Patterson v. American Tobacco Company,* 535 F.2d 257 (4th Cir. 1976), wherein the Court stated that "[i]n view of the substantial precedent sanctioning preferential relief for unlawful discrimination, we reject [appellant's] argument that Title VII forbids the remedy ordered by the district court." This language was in response to the defendant's two-fold challenge to the District Court's imposition of preferential hiring quotas to remedy what was found to be the lingering effects of past unlawful discrimination against blacks and women. Appellant had

argued that preferential hiring and the imposition of quotas was, (1) expressly prohibited by the language of 42 U.S.C. § 2000e–2(j), and (2) was, in any event, unwarranted under the facts of the case because the lower court applied the wrong standard in ascertaining whether appellant's minority employee ratio comported with the minority ratio in the relevant job market. The Court, while explicitly rejecting appellant's Title VII contention, nevertheless vacated that portion of the lower court decree which imposed a quota on the ground, *inter alia,* that an improper minority ratio had in fact been utilized by the trier of fact and that there appeared to be no "compelling need" for the imposition of so drastic a remedy as a quota. The Court's treatment of appellant's Title VII contention seems, at first blush, to constitute binding precedent on this Court. However, a closer reading of *Patterson* discloses that the above-quoted language was not essential to the Court's holding that quotas were not an appropriate remedy under the circumstances of that case. Thus, this Court interprets the language in *Patterson* which concluded that Title VII does not prohibit preferential hiring to compensate for unlawful discrimination, as dicta.[3]

Plaintiff interprets the various affirmative action guidelines, directives and orders as speaking "directly and emphatically" against sex discrimination, and contends that the individual defendants simply "misunderstood" their legal responsibility to consider all applicants on the basis of their own individual merit and without regard to their sex. However, the Court's reading of these documents convinces it that the defendants understood exactly what they were being required to do—hire women.[4]

---

**3.** The dissent in *Patterson, supra,* characterized the majority's language concerning quotas as applying to a "hypothetical" case not actually presented to the Court for decision.

**4.** The objectives underlying the Virginia Commonwealth University Affirmative Action Plan are best typified by the "slight-of-hand" wording of the policy statement which precedes the detailed plan. It reads: "Fully qualified minorities and women will be given equal consideration for employment as best qualified male

Caucasions." This policy statement can be interpreted but one way—that minorities and women with minimum job qualifications will be considered for competitive positions on an equal basis with white males even though the actual credentials of such males might far surpass those of their female or minority competitors for a given position. Females are not merely to be considered "first among equals." They are to be considered and hired ahead of

In so doing, defendants, along with all the guidelines, directives, affirmative action plans and other paraphernalia of the federal civil rights bureaucracy, pay lip service to, but do not really attempt to hide, their actual disregard for the prohibitions in Title VII as they relate to preferential employment practices.[5]

By requiring employers to engage in widespread, pervasive and invidious sex discrimination through the implementation of the pervading affirmative action programs, the U.S. Government is merely perpetuating the very social injustices which it so enthusiastically and properly seeks to remedy. Whatever may be the legal and constitutional status of race quotas (see the dissent in *Patterson v. American Tobacco Company, supra,* and the dissent of Mr. Justice Douglas in *De Funis v. Odegaard,* 416 U.S. 312, 320, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974)), sex quotas are at present not required by controlling authority. The Court does not intend to further their use by legitimizing the imposition of quotas or the practice of preferential hiring on account of sex in this case. Reliance upon such discriminatory practices to achieve "quotas" or "goals" is the use of an unconstitutional means to achieve an unconstitutional end.

■ Defendants argue, however, that the prohibitions in Title VII against hiring preferences and quotas are overridden by Executive Order 11246. As authority therefor, defendants rely on *Contractor's Assn. of Eastern Pa. v. Secretary of Labor,* 442 F.2d 159 (3rd Cir. 1971), which held that Title VII, and specifically § 2000e–2(a) and (j) thereof, does not preclude the President from taking remedial action which, although designed to overcome existing evils through the use of affirmative action plans, actually exacts a standard of compliance directly at odds with what Congress saw fit to codify. While executive orders have the force and effect of law when issued *pursu-*

ant to a mandate or delegation of authority from Congress, *Farmer v. Philadelphia Electric Company,* 329 F.2d 3 (3rd Cir. 1964), it seems axiomatic that the President may not prescribe procedures and directives which overrule validly enacted congressional policies. For the executive to attempt to employ a means which Congress specifically proscribed constitutes an invalid and unconstitutional usurpation of the legislative function by the executive branch of government. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

■ The Third Circuit in *Contractor's Assn.* dealt with the conflict between Title VII and Executive Order 11246 briefly and seemed to accept the mandate of the Order by fiat more than by reason or constitutional imperative. The treatment given the issue by the Seventh Circuit in *Southern Illinois Builders Assn. v. Ogilvie,* 471 F.2d 680 (7th Cir. 1972) and by the First Circuit in *Associated General Contractors of Mass., Inc. v. Altshuler,* 490 F.2d 9 (1st Cir. 1973) is no more satisfactory or persuasive. In any event, the 4th Circuit has not yet made a definitive ruling that invidious sex discrimination, so long as it is called "affirmative action," complies with the Constitution or with § 2000e–2(a) and (j). If the President had the power to overrule an Act of Congress, should be set forth in the Constitution. Until required by the Fourth Circuit, the Supreme Court, Congress, or constitutional amendment so to hold, this Court will not rule that Executive Orders supercede a Congressional mandate.

Since invidious sex discrimination is alien to the Constitution and laws of the United States, this Court cannot, on the basis of the cursory or inconclusive treatment afforded the issue by the circuits which have ruled thereon, render a decision that the President can permit, even require, such discrimination by Executive Order. The Fourth Circuit has affirmatively stated its

---

better qualified applicants who happen to be males.

5. *See, e. g.,* U. S. Dept. of Labor, Affirmative Action Programs, 41 C.F.R. §§ 60–2.12, 60–2.30

(1971); Dept. of Health, Educ. & Welf., Office for Civil Rts., *Higher Education Guidelines,* (1 Oct. 1972); Virginia Commonwealth University Affirmative Action Plan, (17 Oct. 1973).

position with respect to sex discrimination in its recent decision in *Gilbert v. General Electric Co.*, 519 F.2d 661, 667 (1975), wherein Title VII was interpreted as representing ". . . a flat and absolute prohibition against all sex discrimination in conditions of employment. It is not concerned with whether the discrimination is 'invidious' or not. It outlaws *all* sex discrimination in the conditions of employment." Additionally, the Supreme Court has voiced its interpretation of the rationale underlying the enactment of Title VII in *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971):

> Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

Whether or not affirmative action is a good policy, the Court holds it to be bad law insofar as it permits or requires sex discrimination in hiring. The plaintiff in this case is a male, but if the determining factor rests on *which* sex is discriminated against then that factor indicts itself.

There will never be sex or racial peace until the idea of sex or racial discrimination is dead and buried. The primary—the only—beneficiaries of affirmative action plans and their siblings are the thousands of persons engaged in the civil rights business, bureaucrats, lawyers, lobbyists and politicians. The persons who are suffering are the ostensible objects of the plans' solicitude, and persons, such as plaintiff herein, who get flattened by the civil rights steamroller.

The only means of ridding the nation of invidious discrimination is to tear it out . . . "root and branch," *Green v. Sch. Bd. of New Kent Co.*, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Affirmative action only perpetuates it.

### III

■ Defendants next argue that proof of preferential hiring practices, which defendants admit exists in this case, constitutes only a portion of the burden plaintiff must shoulder in order to prevail. Defendants maintain that plaintiff must also show that but for preferential treatment he would have been hired by VCU over the female applicants.

The Court does not interpret the relevant cases as imposing so strict a burden on plaintiff in establishing a prima facie case of discrimination. Contrary to defendants' averments, plaintiff's burden does not necessitate a showing that he was one of the two best qualified male applicants. His burden is met upon a showing that he was discriminated against because of his sex. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Holthaus v. Compton & Sons, Inc.,* 514 F.2d 651 (8th Cir. 1975); *Peters v. Jefferson Chemical Co.,* 516 F.2d 447 (5th Cir. 1975). Defendants admit that plaintiff was so discriminated against. If we placed such a degree of proof as defendants herein suggest on all sex and racial discrimination cases we would take decades to litigate them and, more importantly, the right to be free from invidious discrimination would be sidetracked and eroded by irrelevant inquiries into qualification rankings. If males are to be held by judicial interpretation to a higher and different burden of proof in order to prevail in sex discrimination cases, then the forum itself would be wallowing in the muck of sex discrimination.

### IV

■ Defendants next contend that the Eleventh Amendment immunity precludes plaintiff from suing the State or obtaining

relief in this Court. The Court finds this position to be without merit. Plaintiff represents in his rebuttal brief that he is seeking only declaratory and injunctive relief. The Eleventh Amendment does not bar such actions. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

V

■ Finally, defendants maintain that plaintiff did not satisfy the prerequisite of obtaining a right-to-sue notice from the Attorney General of the United States before proceeding against VCU under Title VII. Defendants conclude that since plaintiff received such a notice only from an Assistant Attorney General, the preliminary requirements of the statute have not been met and the action is premature.

In accordance with the 1972 amendments to Title VII, VCU may be a proper defendant under 42 U.S.C. § 2000e, *et seq.* There is nothing in § 2000e–5(f)(1) which precludes the Attorney General from delegating to one of his Assistants authority to issue a right-to-sue notice. Non-delegation cases such as *U. S. v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), and *U. S. v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), involved governmental intrusion into one's constitutionally protected right to privacy. What may be non-delegable there cannot serve as authority for rendering the delegation herein complained of a nullity. Here the worst that can result is a fair trial in a court of law. Thus, we find defendants' challenge on this point to be without merit.

The Court finds that defendants have invidiously discriminated against the plaintiff on account of sex. VCU and the various individual defendants will be enjoined from any further implementation of affirmative action or any other program that thus offends the Equal Protection Clause of the Fourteenth Amendment, and § 2000e–2(a) and (j) of Title VII. Henceforth, sex shall not be a factor to be considered in the non-sex related employment practices of defendants.

An appropriate order shall issue.