Dr. James Albert CRAMER

v.

VIRGINIA COMMONWEALTH UNIVERSITY et al.

Civ. A. No. 75–0271–R.

United States District Court,
E. D. Virginia,
Richmond Division.

March 14, 1980.

W. H. Cabell Venable, Robert P. Geary, McGrath & Geary, Richmond, Va., for plaintiff.

Richard L. Williams, W. Carter Younger, McGuire, Woods & Battle, Richmond, Va., for defendants.

Yoshinori H. T. Himel, Civil Rights Div., Dept. of Justice, Washington, D. C., Raymond A. Carpenter, Asst. U. S. Atty., Richmond, Va., for intervenors-defendants.

## MEMORANDUM

WARRINER, District Judge.

The history of this litigation is set forth in published opinions.[1] A brief statement of the present posture of the case may be helpful to an understanding of the issues presented.

After the complaint was filed and during discovery, the parties reached agreement on a brief, factual stipulation which relieved plaintiff from proof of a number of incidental, but difficult, factual issues, while at the same time granting defendants protection from backpay, hiring, and damages claims.[2] On this stipulation this Court found clear evidence of invidious sex discrimination against plaintiff. *Cramer v. Virginia Commonwealth University*, 415 F.Supp. 673, 682 (1976).

---

**1.** *Cramer v. Virginia Commonwealth Univ.*, 415 F.Supp. 673 (E.D.Va.1976), *vacated, Cramer v. Virginia Commonwealth Univ.*, 586 F.2d 297 (4th Cir. 1978).

**2.** The interesting question of whether plaintiff is now bound by the bargain reached in entering into the stipulation will not be reached in this opinion. Plaintiff claims, and not without logic, that he gave up his claims to damages, backpay, and his right to be hired, in return for VCU's acquiescence in the stipulation. The effect of the remand by the Fourth Circuit on this stipulation, as more fully developed in text, causes the Court to conclude that this case does not present a genuine case or controversy between the parties, necessitating a dismissal of the action by this Court as moot.

On appeal the United States intervened and exhibited to the Court of Appeals a memorandum allegedly signed by responsible members of the Virginia Commonwealth University (VCU) sociology department which cast doubt on the accuracy of the stipulation upon which this Court's opinion had been based. Giving credit to the memorandum [3] the Fourth Circuit remanded for the taking of evidence and the finding of facts independent of the stipulation. *Cramer v. Virginia Commonwealth University*, 586 F.2d 297, 300 (4th Cir. 1978).

After appropriate pre-trial proceedings, the Court heard extensive evidence presented by the Government in September, 1979. The Court has reviewed the transcript and has studied post-trial briefs.

The hiring procedures adopted by VCU to satisfy the requirements of "affirmative action" were so blatantly and pervasively sexist [4] that even the Government admits in brief that "there was very little chance of hiring a male applicant." This admission was necessary in view of the testimony of the chairman of the sociology department who acknowledged under cross-examination that for a male to break through the female phalanx of applicants and be hired, he would have to be a "superstar."

The hiring processes used by the VCU sociology department to discriminate against males were encompassed with pedagogic legerdemain intended to assuage those of the faculty uncomfortable in the presence of sex discrimination, but the essence of the method was simple. The recruitment committee would select from among women applicants the better qualified women for the job, invite for interview three or four of the women so selected, and hire from among those interviewed. Since the chance that no women would qualify under such a selection procedure approached nil, the converse chance that a male would be hired also approached nil. *See generally* Transcript pp. 133–34, 147–56, 166–67, 206–11, 282–84.

The explicit language of Title VII, 42 U.S.C. § 2000e–2(a)(1)(2), (j) as adopted by Congress clearly prohibits such sex discrimination. Because the language Congress chose has been lost in a welter of executive orders, "affirmative action plans," and pure bureaucratic pressure tactics, it might be well to set the words forth, if merely for historical interest:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire . . . or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify . . applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

Congress, not satisfied merely to set forth the positive duty not to discriminate, added subsection (j), further explaining its intent that no invidious preferences are to be inferred:

(j) Nothing contained in this title shall be interpreted to require any employer . .

---

3. It was developed at trial that the memorandum had been drafted in preparation for litigation. Thus this Court has no great respect for its objectivity. Further, the actual testimony at trial of the drafter of the memorandum showed that his memory was not clear and that his viewpoint was biased. Finally, the testimony and exhibits at trial viewed as a whole show that the memorandum was essentially incorrect and misleading.

4. The conclusively sexist nature of VCU's hiring process was mandated by a directive from the president of VCU that: "[f]ully qualified minorities and women will be given equal consideration for employment as best qualified male caucasions." [sic].

The chairman of the sociology department explained in part his desire to discriminate against males. He observed that half of our people are female and half male. Accordingly, he opined, it would be "ideal" if half his department were female and the other half male. Transcript pp. 241–45. This is what is known as sociology.

to grant preferential treatment to any individual . . . because of the race, color, religion, sex, or national origin of such individual . . . on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer . . . in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section or other area.

42 U.S.C. § 2000e–2(j).

Despite this language the majority of the Supreme Court in an opinion by Mr. Justice Brennan in *United Steel Workers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), held that Congress intended that employers, to correct an "imbalance," may prefer persons who are black on racial grounds in employment opportunities. Justice Brennan found this intent by deduction from the fact that "legislators in both Houses who traditionally resisted federal regulation of private business" supported the bill. 443 U.S. at 206, 99 S.Ct. at 2729, 61 L.Ed.2d at 490–91. He also noted that the racial discrimination in question was not "required" but was said to be voluntary.

Though *Weber* must be accepted by this Court as having established what Congress meant when it wrote the words above quoted, it does not otherwise guide the lower courts in determining what is and what is not permissible race or sex discrimination.[5] Fortunately for this Court, (and probably for defendant VCU) a resolution of that problem is neither necessary nor appropriate in this case. The case is moot.

The facts brought out at trial show that plaintiff originally came to VCU as a last minute, temporary employee. He was hired in the fall of 1973 barely three weeks before the start of classes. His salary was $14,-000.00. Plaintiff, instead of moving to Richmond to assume his position, moved to Rockville, Maryland, for personal reasons and to enable him more conveniently to seek employment in research positions in the Washington, D. C., area. His preference for such a position over continued employment at VCU was contemporaneously acknowledged in conversations with the department chairman, Dr. McGrath. In September, 1973, plaintiff purchased a condominium in Rockville.

During his tenure at VCU, Cramer was not active in departmental affairs and frequently rearranged his teaching schedule to make it more convenient for him to continue residing in Maryland. Though he was aware of the openings of permanent positions in the sociology department he had to be "nudged" into submitting an application. His application, when submitted, consisted of a two-sentence statement without any indication that its submission was other than pro forma.

In the spring of 1974 Cramer applied for and obtained a position with the University of Maryland and he withdrew his application for a position with VCU. His salary at the University of Maryland was commensurate with that he had earned at VCU but the Maryland position was more exciting and desirable to Cramer since it involved considerable travel throughout Europe at a relatively low cost to Cramer and his wife. Upon completion of his stint at Maryland, he successfully sought employment at Georgetown University in April or May of 1975. He applied at no other institution at that time.

It was in June of 1975 that he filed the instant suit. He sought employment, backpay, fringe benefits, and the like. He also sought a declaratory judgment and general injunctive relief against sex based employment discrimination.

---

5. *United Steel Workers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480, 492 (1979). "We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans. It suffices to hold that the challenged . . . plan falls on the permissible side of the line."

In the fall of 1975 plaintiff purchased and occupied a dwelling in Washington, D. C. He presently resides in that dwelling. His starting salary at Georgetown was about $19,000.00 compared with a range of from $14,000.00 to $18,000.00 for a comparable position at VCU.

In the early part of 1976 plaintiff formally abandoned any claims in his lawsuit for monetary relief and desisted in his prayer for employment. The only relief remaining was for a declaratory judgment that the hiring practices of VCU were unlawful and that an injunction issue to prevent continued sex discrimination. Solely on the basis of stipulated facts (not the facts above set out) this Court entered an order granting the declaratory and general injunctive relief on 28 May 1976.

Thereafter, concerned with possible mootness, plaintiff sent a letter of inquiry about employment to VCU on 11 October 1976. Under all the facts and circumstances the Court does not consider that letter to have been a genuine effort by plaintiff to seek employment with VCU. This belief is buttressed by the fact that in his present situation plaintiff is enjoying a salary of approximately $30,000.00 with an opportunity to make as much as $5,000.00 additional through part-time work. At VCU the range of salaries for which he might be qualified runs from $15,000.00 to $25,000.00 per year. This view is further supported by the concessions set forth in the stipulation wherein the plaintiff waived all employment-related avenues of relief such as back-pay or rehiring, leaving only declaratory and general injunctive relief issues before the Court.

Despite persistent claims by defendants and intervenor that plaintiff's claims for declaratory relief are moot, plaintiff failed to take the witness stand at the hearing in this case on 6–7 September 1979 to articulate any personal, individualized dispute he has with VCU.

 In determining whether an action presents an "actual controversy" within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, or is instead moot,

the question . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.*

*Preiser v. Newkirk*, 422 U.S. 395, 402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (emphasis in original), *quoting Maryland Casualty Co. v. Pacific Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 820 (1941); *see also Danzy v. Johnson*, 417 F.Supp. 426, 431–35 (E.D.Pa.1976), *aff'd without opinion*, 528 F.2d 1273 (3rd Cir. 1978). "[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in . . . case[s] before them." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). Instead, "[t]he rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk, supra*, 422 U.S. at 401, 95 S.Ct. at 2334, *quoting, Steffel v. Thompson*, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1215 n. 10, 39 L.Ed.2d 505 (1974) (citations omitted).[6]

 No order that the Court could enter in this case could change plaintiff's status for the better, except possibly to give him a sense of satisfaction, since he seeks nothing of defendant than that defendant be found to have engaged in sex discrimination and be enjoined from continuing such practices. Such a declaration or injunction will have no more effect upon plaintiff than it will have upon any other person similarly situated. His prior claims for damages and

---

6. The Court recognizes its error in failing to dispose of this action for lack of a genuine case or controversy when the parties entered into the stipulation on 13 February 1976 and plaintiff waived his personal claims. That the Fourth Circuit addressed the substance of plaintiff's claim does not make non-mootness the law of the case. Mootness issues were not adjudicated by the Court of Appeals in its opinion vacating the trial court's decision.

other relief, if ever entitled to credit, have been released.[7]

■ Although VCU claims to have abandoned sex-based discrimination and asserts that it has returned to merit selection, this claim by VCU is not decisive to a determination of mootness. "[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).[8] In this case it is not the alleged voluntary cessation which rendered the case moot, it is, instead, the absence of a genuine case or controversy from which plaintiff prospectively could obtain relief. *See Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964).

Finally, this is not a case "capable of repetition, yet evading review," *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). Though it may be capable of repetition it would not evade review since a bona fide application to VCU on the part of plaintiff, or anyone else, which is met with sex discrimination is readily susceptible of review upon a timely filed complaint.

Plaintiff in his rebuttal brief asserts a present subsisting interest in obtaining employment at VCU. As noted above, if that interest be converted into an application and if he then be subjected to sex discrimination, the Clerk's Office of this Court will be open to receive his complaint.

Plaintiff has maintained at several junctures since remand that if he is to be deprived of the benefits of the bargain he obtained by agreeing to a stipulation of facts, then he should have the option of re-asserting his claims for damages, backpay, and a job. Plaintiff asserts, without contradiction, that he agreed with VCU to submit the case on stipulation as part and parcel of an agreement that he would waive the personal claims while VCU would waive certain defenses. In other words, the stipulation was not a mere convenience to the parties, but was the product of an agreement involving valuable consideration on both sides. Plaintiff maintains, correctly, that the remand directs that the record be opened and evidence be received on matters about which the stipulation dealt. In other words, the trial court was not to be bound by the stipulations but the parties were directed to proceed *ore tenus* without regard to the claims abandoned and defenses foresworn evidenced by the stipulation.[9]

7. Dependency upon entitlement to attorney's fees does not avoid dismissal for mootness. Attorney's fees under the Attorney's Fees Awards Act of 1976 may be allowed to a "prevailing party." 42 U.S.C. § 1988 (1978); *Bonnes v. Long*, 599 F.2d 1316, 1318–19 (4th Cir. 1979). The standards by which to assess a party's entitlement to such an award have been set forth in this Circuit in *Bonnes, supra*. Under those tests, a plaintiff cannot be a prevailing party where his claim is dismissed as moot, thus the plaintiff in this case cannot keep his present claim alive by asserting a claim to attorney's fees.

8. See *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642, 649 (1979) for an exposition of the standards applicable to a finding of mootness in the voluntary cessation context.

9. The opinion and, especially, the action of the Court of Appeals suggested to this Court that the appellate court suspected improper collusion in the formulation of the stipulation. The

credit given the memorandum tendered during appeal by the United States as intervenor, and the remand based thereon, led this Court to believe that the Court of Appeals was concerned that the Attorney General of Virginia was "taking a dive," and had entered into a stipulation contrary to fact in order to invite an adverse judgment.

This thought had also concerned the trial court when the stipulation was originally filed. Appropriate inquiry at that time had stilled the trial court's concern.

Nevertheless, upon remand, and in order to satisfy what the trial court perceived as a *sub silentio* order of the Court of Appeals, the trial court directed counsel for plaintiff and the Assistant Attorney General then representing VCU, separately to file a detailed affidavit of the facts and circumstances surrounding the entry into the stipulation. Further, the trial court directed counsel for the United States to investigate through discovery and otherwise the possibility that there had been an impropriety in the matter of the stipulation. The

[redacted] There are serious questions as to whether a court may disregard the stipulations of responsible parties entered into in good faith. *Insurance Company of North America v. Northwestern National Insurance Co.*, 494 F.2d 1192, 1195–96 (6th Cir. 1974); *cf. J. F. Edwards Construction Co. v. Anderson Safeway Guard Rail Corp.*, 542 F.2d 1318, 1322 (7th Cir. 1976); *see generally*, 73 Am.Jur. *Stipulations* §§ 4, 8, 11, 18 (1974). So long as there remains a "case or controversy" it would seem appropriate that adversaries may agree mutually to give up certain claims and defenses in order to make a suit more manageable or for any other legitimate purpose.[10]

The ruling of the Court of Appeals, at the instance of the intervenor United States, effectively destroyed the good faith bargain entered into by competent parties on advice of counsel. Although the bargain was destroyed it was not through the act or will of plaintiff or plaintiff's adversary VCU. Instead the breach was a consequence of a determination in the nature of *force majeure*. Throughout the pre-trial proceedings on remand and at hearings held on 6 and 7 September 1979, plaintiff and defendant VCU consistently reaffirmed their intention and willingness to abide by and be bound by the stipulations entered into on 13 February 1976. *See e. g.* Transcript pp. 18, 322–25, 329–30, 422–27. As a consequence of being thus deprived of his bargain plaintiff has asserted his claim of a right to "return to square one," claim damages, and prove his case without regard to the stipulation.

[redacted] Although the action of the Court of Appeals in not considering the parties' vested right, if any such there be, in the bargain they reached, is troubling, and although plaintiff's claim to "square one" relief is wholly logical under the circumstances, the Court will not reach this issue since, as noted, the facts found on remand show that from the beginning plaintiff's interest in the suit was, pardon the expression, academic: he did not want a job, he suffered no damages, and he was entitled to no backpay. Plaintiff's interest in the suit was to vindicate the right of males to be free from sex discrimination. Such an interest is insufficient in this case to maintain a case or controversy. As indicated above, the case was moot at the point in the original trial at which the stipulation was entered into; upon remand, this Court considers that the bargain was reaffirmed by the parties despite vitiation by the Fourth Circuit, thus the case was likewise moot; finally, treating the stipulation as vitiated, the findings of fact of this Court as to plaintiff's desire for a job, damages and entitlement to backpay leaves the asserted claim for declaratory relief again lacking the individualized immediacy and reality necessary to constitute a case or controversy. On any view of the case, then, it is moot.

Having determined that this case is moot through the absence of a genuine case or controversy between the parties as contemplated in Article III of the United States Constitution, it follows that the action must be DISMISSED.

An appropriate order shall issue.

Government reported that it had discovered no evidence of impropriety and the Court's own examination of the record discloses none. The Court is satisfied that the stipulation was a bona fide effort by the parties and their counsel to save litigation costs and court time while presenting the essential factual situation for decision. Not only is such an effort not improper, it is to be encouraged. The history of this case, however, may not enhance the popularity of stipulations among the Bar.

**10.** For instance in a simple personal injury case involving claims of negligence, contributory negligence and damages, it would be entirely appropriate, it seems to this Court, for plaintiff to agree to abandon by stipulation certain damages claims (say, lost wages) in return for defendant's stipulation that plaintiff was not contributorily negligent. If it should later appear to either the trial or an appellate court that there was credible evidence that plaintiff was, in fact, contributorily negligent, or that her claim for lost wages was suspect, or both, this appearance, or even the actuality should not alter nor render nugatory the good faith bargain entered into by competent parties on advice of counsel. *Cf. King v. Edward Hines Lumber Co.*, 68 F.Supp. 1019, 1021 (D.Or.1946); 3 Moore's Federal Practice ¶ 16.20 at 1138 (2d ed. 1979).