James Wesley WARD, Plaintiff,

v.

ARKANSAS STATE POLICE, Defendant.

No. LR–C–77–256.

United States District Court,
E. D. Arkansas, W. D.

July 29, 1980.

Ralph Washington, John W. Walker, P. A., Little Rock, Ark., for plaintiff.

Debby Nye, Asst. Atty. Gen., State of Arkansas, Little Rock, Ark., for defendant.

## MEMORANDUM AND ORDER

## PRELIMINARY STATEMENT

HENRY WOODS, District Judge.

Plaintiff James Wesley Ward, a black applicant for employment with the Arkansas State Police, filed suit on August 26, 1977 in the United States District Court under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Paragraph II of the complaint alleges a class action proceeding for a declaratory judgment declaring the plaintiff's rights, for an award of monetary relief, for a permanent injunction restraining the defendant from maintaining policies, practices, customs and usages of discrimination against plaintiff and other blacks because of their race with respect to hiring, tenure, compensation, job classification, terms, conditions and other privileges of employment. Plaintiff alleged that he had applied for a State Police position in May or June, 1970 and was required to take a test which he was told that he failed. He reapplied in January, 1975 with the same result. He applied again in May of 1976 and was not notified of the status of his application. On the latter occasion he was not scheduled for an examination. The complaint goes on to charge the Arkansas State Police with a historically discriminatory hiring policy. Plaintiff asked for a declaratory judgment that the actions of the defendant violated his rights under 42 U.S.C. § 2000e et seq.; that he and his class receive compensation; and that various discriminatory practices of defendant be terminated.

The Attorney General of Arkansas filed an answer on behalf of the State Police which amounted to a general denial of plaintiff's allegations. Other than a petition to intervene by three other individuals represented by another law firm, there was no activity in this case whatsoever until January 28, 1980, when District Judge G.

Thomas Eisele wrote to counsel enclosing a pre-trial questionnaire to be answered by the parties by June 1, 1980. Discovery was cut off on July 1, 1980. Counsel for the plaintiff was directed to file a motion to certify class within sixty (60) days. In response to this letter, Mr. Ralph Washington, one of plaintiff's attorneys, wrote as follows to Judge Eisele on March 26, 1980:

> Mr. Walker has requested that I inform you that the above-captioned case has been substantially resolved. We request that this matter be removed from your class action calendar. Also, we request that it be removed from your trial calendar. We are in the process of attempting to resolve this matter on an individual basis in behalf of plaintiff named above.

Since no motion for class certification had been made within the time required and in view of the above letter, the Clerk transferred this case from the class action docket to the individual docket and assigned it to the undersigned for trial on July 16, 1980. On June 9, 1980 Mr. Washington wrote as follows:

> Mr. Walker has requested that I respond to your letter of June 4, 1980, regarding the above-captioned case. As requested by you, we are complying with the Pretrial Questionnaire from your office. However, Mr. Walker wants the Court to schedule a conference hearing in the above matter to resolve the settlement agreement entered into between a former partner of Mr. Walker's lawfirm, Honorable Henry L. Jones, Jr. and Frank B. Newell, Deputy Attorney General, with said agreement to be resolved pursuant to the consent degree entered between the United States of America and the State of Arkansas which was signed by the Honorable Terry L. Shell, United States District Judge. We strongly feel that the change of administration does not change the previous settlement agreement between parties. Therefore, we respectfully request a conference hearing before Your Honor regarding the settlement agreement in the above-captioned case.

In response to this letter, the court scheduled a conference on June 24, 1980 with counsel for the respective parties. At this

conference it was agreed that a hearing should first be held as to whether a settlement had been effectuated before proceeding to a full trial on the merits.

The basis of the purported settlement, as noted in Mr. Washington's letter of June 9, 1980, was a consent decree entered on February 1, 1978 by the late Judge Terry Shell in civil action LR–C–78–25, styled *United States v. States of Arkansas,* Douglas W. Harp, Director of the Arkansas State Police, et al. The court takes judicial knowledge of this decree and incorporates it by reference herein.[1] The decree provided for

1. With regard to this plaintiff, the following portions of the consent decree are particularly apropos:

    The plaintiff United States of America filed its Complaint in this action against *inter alia* the State of Arkansas and members of the Arkansas State Police Commission alleging that the defendants are engaged in a pattern or practice of discrimination in employment on the basis of race and sex, in violation of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. 3766, as amended. The parties, being desirous of settling this action by appropriate decree, agree to the jurisdiction of this Court over the respective parties and subject matter of this action and hereby waive the entry of findings of fact and conclusions of law. The State of Arkansas and its officials, sharing the goal of insuring equal employment opportunity within the Arkansas State Police and desiring to avoid protracted and unnecessary litigation, accept this Decree as final and binding among the parties signatory hereto as to the issues resolved herein, as well as on all persons who consent to the relief hereinafter provided. This Decree, being entered with the consent of the defendants, shall not constitute an admission, adjudication or finding on the merits of the case, and the defendants deny that any unlawful discrimination has occurred.

    IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

    1. The defendants, their officials, agents, employees and successors, and all persons in active concert or participation with them in the performance of state police functions covered by the Complaint filed in this action are permanently enjoined from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any black or potential applicant for, employment with the Arkansas State Police Department [hereinafter ASPD or the Department] because of such individual's race, color, or sex. Specifically, the defendants shall not discriminate against any such individual in hiring, promotion, assignment, upgrading, training, compensation, discipline or discharge because of race, color, or sex, except that the Department may take into account race, color, or sex in assignments to the extent that these characteristics may be legitimately required by the special nature of an assignment or an investigation. . . .

    7. Defendants may administer a written examination on a pass-fail basis for the entry level position of trooper for the purpose of establishing a list of qualified applicants for such position, provided that the use of such an examination shall not be a defense for failure to meet the interim and long term goals set out in Paragraph 2 of this Decree unless the parties mutually agree or the Court finds that the examination and the passing score do not have an adverse discriminatory impact or unless the parties agree or the Court finds that the examination has been shown to be predictive of or significantly correlated with important elements of work behavior by professionally acceptable methods of validation.

    Defendants may administer to applicants any other written examination they choose for validation purposes provided that the scores obtained on the examination are not in any way utilized for the purpose of selecting candidates for the entry level position of trooper.

    . . .

    15. As soon as possible (but in any event within one year) after the entry of this Decree, plaintiff shall have access to and review the personnel records of the defendants for the purpose of identifying blacks and women who may have been victims of unlawful race or sex discrimination subsequent to January 1, 1973. Upon completion of the review, plaintiff shall indicate to the Department the identity of persons for whom specific relief is sought and the nature of the relief. If the affected parties are able to agree upon the relief, the individual shall be notified of the relief offered and the basis for it, and of the individual's right to accept the offer or to reject it and proceed individually pursuant to 42 U.S.C. 2000e–5, provided that nothing herein shall constitute a waiver by defendants of any applicable Statute of Limitations.

    16. For purposes of Paragraph 15 of this Decree, victims of unlawful race or sex discrimination subsequent to January 1, 1973 shall be identified as follows:

    (a) Black applicants who took and failed the entry examination from January 1, 1973 to May 8, 1975 and who otherwise would have been eligible for employment at the time they failed this examination. Those applicants who are found to be acceptable for

back pay for applicants in various categories who had failed the examination and were otherwise qualified. This decree was approved by Frank B. Newell, Deputy Attorney General of the State of Arkansas, and David L. Rose and Katherine P. Ransel for the U. S. Department of Justice.

U. S. Magistrate Henry Jones, who represented plaintiff in 1977 and 1978 as a member of the present law firm of plaintiff's counsel, and Mr. Frank Newell, who represented the State Police at that time, were present at the conference held on June 24, 1980 between court and counsel. They were directed to prepare a joint Report to the Court concerning the settlement negotiations carried on between them.

These gentlemen prepared and filed two documents with the Court, and these have been introduced in evidence by the Court without objection from the parties:

*REPORT TO THE COURT BY HENRY L. JONES, JR. AND FRANK B. NEWELL*

(1) The below signed attorneys entered into settlement discussions concerning the above styled case in 1977 and 1978. Henry Jones represented the Plaintiff on behalf of Walker, Hollingsworth and Jones, and Frank Newell represented the De-

fendant on behalf of the Attorney General's office. Frank Newell's primary contact with the Arkansas State Police was through discussions with Major Lawrence E. Gwyn, the Director of Personnel and Training. Henry Jones consulted with John Walker who represented Mr. Ward. (2) Mr. Jones and Mr. Newell agreed that Mr. Ward would be permitted to take a written examination administered by the Arkansas State Police. The examination was being prepared or had been prepared pursuant to the tentative terms of a consent decree proposed to be entered in *United States v. State of Arkansas, et al.* United States District Court, Eastern District of Arkansas, Docket No. LR–C–78–25. Mr. Jones understood that Mr. Ward would be hired upon successful completion of the examination. It is agreed that this understanding was reasonable. See the attached correspondence dated July 1, 1980, from Mr. Newell to Mr. Jones.

(3) The only reference made to the consent decree described in paragraph (2) above in connection with the back-pay terms of a settlement of Mr. Ward's claim was to the back-pay provision contained therein. References were made at

employment under a new selection process without adverse impact shall be placed on eligibility list A.

(b) Black applicants who took and failed the entry examination from May 8, 1975 until the initiation of the new selection process and who otherwise would have been eligible for employment at the time they failed this examination. Those applicants who are found to be acceptable for employment under the new selection process on eligibility list B, together with any past or present applicants not identified as victims of unlawful race or sex discrimination under the terms of this decree.

.        .        .        .        .

(d) Black applicants who were on an eligibility list from January 1, 1973 until May 8, 1975 and women who were on an eligibility list from January 1, 1973 until the present, did not refuse employment and were not appointed from that list shall be placed on eligibility list A, if they still are interested in and qualified for employment with the Department.

Defendants shall fill fifty percent (50%) of future vacancies with qualified black mem-

bers of the affected class set out above comprising eligibility list A until such time as that list is exhausted. . . . Upon employment of persons comprising eligibility list A, the filling of vacancies shall proceed according to the provisions of Paragraph 2, above. . . .

17. Whenever the parties are unable to agree on a specific matter falling within the general provisions of this Decree that contemplates mutual agreement, either party may move the Court for a resolution.

18. The Court shall retain jurisdiction of this action for such further relief as may be necessary or appropriate because of any change in law or fact or to effectuate the purposes of this Decree. At any time five years from the date of this Decree or, pursuant to the provisions of Paragraph three (3) of this Decree, defendants may apply, with sixty (60) days notice to plaintiff, for termination of this Decree; and upon a showing of achievement of the goals of this Decree, such motion shall be granted by the Court, absent good cause shown by plaintiff.

other times to consolidation of Mr. Ward's suit with that of the United States.

(4) Neither Mr. Jones nor Mr. Newell recall any mention during their discussions of a background check, and the assumption of both attorneys was that, upon successful completion of the examination, there would be no problem with Mr. Ward receiving employment with the Arkansas State Police, subject to the considerations set out in the attached correspondence referenced above. This understanding was based on Mr. Newell's communications with Major Gwyn and Mr. Jones.

(5) Mr. Newell and Mr. Jones agreed that, if hired, Mr. Ward should receive back-pay, but no amount was agreed upon. Mr. Newell and Mr. Jones discussed the amounts listed in the categories found in the consent decree and the amounts mentioned in a January 24, 1978, letter from Mr. Jones to Mr. Newell.

(6) Mr. Newell and Mr. Jones never entered into a formal, final settlement agreement. However, to the extent indicated above, counsel did have an understanding based on good faith, and neither counsel anticipated any problems concerning resolution of the matter, although Mr. Newell, for the reasons indicated in the attached correspondence, believes that he lacked authority to guarantee his client's acquiescence to any proposed settlement agreement.

/s/   Henry L. Jones, Jr.

/s/   Frank B. Newell

Date: July 3, 1980

The second document is a letter from Mr. Newell to Judge Jones dated July 1, 1980 regarding the settlement.[2]

2. Yesterday, June 30, 1980, I finally had an opportunity to review the Attorney General's files containing my notes as to our conversations about the referenced case and other materials pertaining to it. I now see two problem areas associated with our previous settlement discussions.

Shortly after we concluded the meeting in Judge Woods' office last Tuesday, it occurred to me that the question of the exact nature of *our discussions was a subsidiary one,* the initial question being whether I had authority to make a commitment that would bind my client, the Arkansas State Police. As I am sure you are aware, the Director of the Arkansas State Police appoints eligible applicants to the force subject to the approval of the Arkansas State Police Commission. See Ark.Stat.Ann. Sec. 42–403.2 (Supp.1979); 42–405 (Repl.1977). Although the Commission followed the advice of the Attorney General in regard to settlement of the suit by the United States Justice Department against the State, it never expressly or impliedly authorized the Office or me to make commitments in regard to hiring procedures generally or with regard to specific individuals in the context of that suit or otherwise. By the same token, even though Colonel Harp acted on the advice of the Office, he never impliedly or expressly delegated to the Office authority to *make hiring decisions or to change hiring* procedures. Further, my notes regarding my presentation of the terms of the consent decree to the Commission contain references to settlement negotiations with private plaintiffs. It seems obvious that I told the Commission that I might be communicating to them a settlement offer in the future if an agreement was reached. No such communication ever occurred.

My contact person with the Arkansas State Police was, as you know, Major Gwyn, the Personnel Director, who conferred from time to time with Colonel Harp, the Director. Under most circumstances, I acted on the assumption that Major Gwyn spoke for Colonel Harp in the sense that Colonel Harp was likely to follow Major Gwyn's suggestions, although he was, of course, not bound to do so. Accordingly, looking back I can only conclude that I had no authority to enter into any settlement agreement binding the Arkansas State Police to hire Mr. Ward.

As for the nature of our discussions, the files I reviewed contained very little as to our conversations, so frankly my recollection as to their thrust and specifics is not much improved. I do agree, though, that we talked on several occasions about settling Mr. Ward's suit without regard to the position the Office took as to the proposed intervention of Messrs. Parker and Bridgeford. On reflection, I am convinced that we were trying to reach agreement as to what I would recommend to Colonel Harp and the Commission in regard to Mr. Ward's case. A letter from you dated January 24, 1978, setting out Mr. Ward's income for the years 1973–77, confirms my recollection that we *discussed the possibility of a back pay award* as well as the hiring issue. However, a note in the file also indicates that the previous test failures were not the only impediments to Mr. Ward's hiring. The note doesn't indicate the number, nature, or gravity of other obstacles. I therefore assume that, although our discussions focused on test passing, they

· On January 15, 1979 Ward appeared and successfully passed a new test formulated pursuant to the Consent Decree. The test results were known approximately one month later. On February 20, 1979 Major Gwyn requested that Investigator Bill Eddins of the State Police begin the background investigation on plaintiff Ward. Eddins contacted Ward on March 1, 1979 to advise him of the ongoing background check and the upcoming personal interview. On April 4, 1979 Sgt. Eddins wrote Ward the following letter:

> On March 1, 1979, reference our telephone conversation, you were informed that a background investigation was being conducted, and that I would contact you the following week to conduct a required personal interview, and also pick up the grade transcripts of your high school and completed college hours.
>
> On March 6, I called your residence, and was informed your whereabouts were unknown. I left a message for you to call me at the earliest possible date regarding your application.
>
> On March 8, I again called your residence and spoke with a female who identified herself as your mother, and was again informed that your whereabouts were unknown. I left a message for you to contact me as soon as possible.
>
> Mr. Ward, it is imperative that you contact me as soon upon receipt of this letter as possible, either by telephone or at my office at the Personnel Division, Arkansas State Police, 3701 West Roosevelt Road, Little Rock, Arkansas, and advise me if you are still interested in gaining employment with this Department.

On April 18, 1979 the Personnel Office of the State Police received the following letter which was dated March 9, 1979:

(Def. Exh. 3)

Dear Mr. Eddins:

> This letter is in reply to our telephone conversation concerning James W. Ward. The reason he didn't respond to your telephones calls and letter is because he is now in the Army. He left March first for Ft. Jackson S.C. In case you want to write him and let him know you are keeping his file and maybe when he get out you all will reconsider
>
> PFC James Ward
> 431–82–7221
> D–4–1–3rd Plt.
> Ft. Jackson, S.C. 29207
> Thank you very much—
> His Mother—
> Sincerely, Lovie Ward

At the hearing held on July 16, 1980, to determine whether, as plaintiff contended, this case had been settled, plaintiff stood on the Court's Exhibits (1) and (2) and presented no further evidence. The defendant called Colonel Douglas Harp, Superintendent of State Police, Major Gwyn, retired, who during the pertinent period was in charge of personnel recruitment and hiring, and Bill Eddins, a State Police Investigator, who had attempted to conduct the background investigation on the plaintiff Ward.

---

took place in accordance with an assumption on my part at least that all else would go well for Mr. Ward. This negotiation posture is confirmed by my contemporaneous correspondence with Richard Mays regarding Mr. Parker and Mr. Bridgeford and the treatment of their claims, where it is clear that everyone recognized that Commission approval was essential to any hiring or back pay award decision. However, I do concede that you might reasonably have interpreted my preoccupation with the testing issue as an indication that this was all that was keeping Mr. Ward off the eligibility list, especially in light of Major Gwyn's lack of opposition to the suggestion that he be hired if he passed the revised test. In addition, I found another note in the file indicating that the Ward matter could not be settled until the results of the test were in. The note did not mention a background examination.

Thus, I'm sure that we agreed that passing the revised examination was a prerequisite to my recommending that Mr. Ward be hired and compensated through a back pay award or otherwise. I can also see how you could reasonably have thought that this was the only prerequisite, since it is entirely possible, even probable, that I never mentioned a background examination, even though the note referred to above indicates that this was an issue of unspecified proportions. My notes do not indicate that we ever agreed upon an amount to be awarded Mr. Ward in the event that he was hired.

.    .    .    .    .

The defendant also called the plaintiff's mother to identify her letter (Def. Exh. 3, *supra*). She testified that her son is still in the Army and is stationed at Ft. Carson, Colorado.

The substance of Colonel Harp's testimony was that he had never authorized the hiring of Ward, that he was the ultimate authority on hiring applicants subject to approval of the State Police Commission. Colonel Harp denied that he had ever authorized Deputy Attorney General Newell to settle this case solely on the basis of Ward's being able to pass the test. He described the hiring procedures of the State Police as follows. After application is filed, a test is given. If the test is passed, a complete background investigation is performed. When this is completed, the applicant is interviewed. One of the main purposes of this interview is to give the applicant an opportunity to explain any derogatory information developed during the investigation. Colonel Harp testified that among other things, his organization is looking for any criminal record of applicant, past job performance, financial responsibility, evaluation of character, and whether the applicant is trainable as a State Police trooper. No one would ever be hired without such an investigation. Colonel Harp considers this to be the most important part of the hiring process. He considered Ward's background unsatisfactory on the basis of the investigation performed by Investigator Eddins. However, the investigation was not completed because Ward did not afford Eddins an opportunity to interview him. It is possible that Ward may have had an explanation for the derogatory information developed through the investigation. He was never formally rejected for the job because he enlisted in the Army before the investigation was completed. As to that part of the investigation which was completed, Harp stated that he attached some weight to plaintiff's credit history, but his main reason for denominating the plaintiff's background as unsatisfactory was his poor record of past job performance.

Major L. E. Gwyn's testimony confirmed that of Colonel Harp. Gwyn denied that he authorized settlement of this case or that he had authorized the hiring of plaintiff without a background investigation.

The background investigation of plaintiff conducted by Investigator Eddins was introduced into evidence. (Def. Exh. 2.) In this report, Eddins had recommended against hiring plaintiff. He said his recommendation was based on the derogatory information contained therein, which the plaintiff had never explained. Eddins said that no final decision had been made, as far as he knew, since no interview had been conducted. He testified that in the past he had given a negative recommendation on an applicant who was hired in spite of it. On the contrary, he had recommended applicants who had been rejected.

The derogatory information contained in the Eddins report was for the most part concerned with Ward's employment history. He worked for the Arkansas Regional Juvenile Program at Helena, Arkansas from 1972–75. He was not retained after the Federal Grant expired, although his supervisor stated that he could have retained him. Ward was criticized because "he stayed away from the office too long on cases, and was not conforming to the rules of the office . . . . did not apply himself as he should have." A co-worker stated that Ward "will not follow directions . . . and will not conform to rules." (Def. Exh. 2, p. 6.) Ward was employed by the Greenville, Mississippi Police Department from 1975 until 1977 when he resigned. Five of plaintiff's supervisors in this department were interviewed, including the Chief of Police. They unanimously recommended that plaintiff not be hired. He was variously described as having a bad attitude, being uninterested in his job, undependable, consistently late for work, high tempered, and lacking in good judgment. (Def. Exh. 2, pp. 7–8.) From May, 1977 to October, 1977, Ward worked for the Police Department of Pine Bluff, Arkansas. The Chief of Police of that department said that Ward "refused to accept orders and was basically lazy." (Def. Exh. 2, pp. 8–9.) He was terminated from this job, because he broke departmental rules by working after hours in a liquor store. From December,

1977 to March, 1978, plaintiff was employed by the Humphrey, Arkansas Police Department. He was dismissed because of citizens' complaints, failure to check in and out on his radio, failure to appear in court, and failure to conform to departmental rules. (Def. Exh. 2, p. 9.) Afterwards, plaintiff worked for short periods at a Greenville, Mississippi Department Store and a shoe store. Because of his poor job performance, neither establishment said they would rehire him. (Def. Exh. 2, p. 9.) In addition to this rather dismal employment history, the background investigation disclosed that Ward's credit history was less than favorable. (Def. Exh. 2, pp. 4–5.)

The above information developed in the background investigation of Ward is relevant on the question of whether a settlement was in fact made. It is relevant as to whether, as the State contends, a background investigation is a necessary ingredient of the hiring process for an Arkansas State Police Trooper. The results of the background investigation in this case support the contention of Colonel Harp that such an investigation was a *sine qua non* of the hiring process.

Before conducting the background investigation on Ward, Investigator Eddins called him on March 1, 1979 and asked if he was still interested in a position with the Arkansas State Police. Receiving an affirmative answer, Eddins advised him that in a few days he would call back to set a time for an interview. Strangely enough on this same day Ward left for Ft. Jackson, S. C. to begin an enlistment in the U. S. Army, according to the testimony of his mother confirming the text of her letter of March 9, 1979 (Def. Exh. 3). It is reasonable to assume that he must have actually enlisted in the Army a few days prior to leaving for South Carolina on March 1, 1979. Therefore, plaintiff would seem to have known that he was going into the Army at the time he told Eddins that he was still interested in working for the State Police. On March 6, 1979 Eddins called plaintiff's residence and was told that his whereabouts were unknown. On March 8, 1979 he again called, and plaintiff's mother stated that plaintiff's whereabouts were unknown. He left a message for plaintiff to call him as soon as possible. At all these times plaintiff was already in the Army at Ft. Jackson, S. C., having left for this duty on March 1, 1979, according to the letter from plaintiff's mother to the State Police dated March 9, 1979. (Def. Exh. 3.) No reason has been advanced as to why plaintiff and his family withheld the information concerning his enlistment from the State Police until March 9, 1980.

## FINDINGS OF FACT

1. The Deputy Attorney General did not have the authority to enter into the settlement which plaintiff contends was made.

2. No settlement agreement or written stipulation was made a part of the record in this case by the parties.

3. There was never a "meeting of the minds" regarding the settlement negotiations.

4. No settlement of this matter was made by Ward's attorney and the Deputy Attorney General representing the State Police.

5. Hiring of applicants for positions with the Arkansas State Police is governed by a Consent Decree entered on February 1, 1978 by the late U. S. District Judge Terry Shell in *United States of America v. State of Arkansas, et al*, LR–C–78–25 and by Ark.Stats.Ann. §§ 42–403.2 (Supp.1979) and 42–405, 406 (Repl.1977).

6. Procedures for hiring State Troopers by the Arkansas State Police Department require:

   (a) filing of an application;

   (b) successfully passing a written examination;

   (c) a background investigation; and

   (d) an interview with the applicant.

These procedures are in conformity with Judge Shell's decree, *supra*, and the Arkansas statutes cited *supra*.

7. The background investigation is the most important part of the hiring process.

(8) The derogatory information developed concerning this plaintiff by the State

Police Investigator demonstrates the advisability of conducting such a background investigation.

(9) The Director of State Police, Colonel Doug Harp, had the sole responsibility for hiring State Police Troopers, subject to approval by the Arkansas State Police Commission.

10. Colonel Doug Harp at no time hired plaintiff, authorized his hiring or advised anyone that he would be hired on the sole condition of passing the written examination.

11. The plaintiff applied for the position of Trooper with the Arkansas State Police and successfully passed the written examination on January 15, 1979.

12. The Arkansas State Police did not complete its hiring procedures with respect to plaintiff because he withdrew himself from the hiring process without affording the State Police Investigator an opportunity to interview him and before Colonel Doug Harp had an opportunity to act on his application.

13. On March 1, 1979 when plaintiff told the State Police Investigator he wanted to proceed with his application, he had already enlisted in the United States Army.

14. Such an enlistment constituted an abandonment of any attempt at that time to seek employment with the State Police Department.

15. There presently exists no justiciable case or controversy between plaintiff and the Arkansas State Police.

16. The plaintiff is not entitled to back pay or attorney fees.

## CONCLUSIONS OF LAW

■ *The contention that a settlement was effected.* The plaintiff's basic contention in this hearing is that the case was settled by an agreement between plaintiff's attorney, Henry Jones, and the Deputy Attorney General, Frank B. Newell, who was representing the State Police. Plaintiff contends that, under this settlement, plaintiff was to be employed by the State Police as soon as he passed the examination given on January 15, 1979, irrespective of any requirement of a background investigation and irrespective of the requirements of the Arkansas statutes that hiring of State Police personnel was the responsibility of the Director, subject to approval by the State Police Commission. Ark.Stats.Ann. § 42–406 (Repl.1977); Ark.Stats.Ann. § 42–403.2 (Supp.1979) and § 42–405 (Repl.1977).

The first question to be decided is whether a settlement was arrived at between the attorneys for the litigants in this case. An examination of evidence on which plaintiff relies consisting of the joint statement of Newell and Jones and Newell's letter of July 1, 1980, clearly discloses that no settlement was effectuated. Even though this purported settlement was made in 1978, no written stipulation was entered into with respect thereto. Settlements in the federal courts of this district are made by formal written stipulation. Indeed the Local Rules of the Court provide that no agreement between counsel will be recognized unless it is reduced to writing (see Local Rule 14). If these considerations are disregarded, it is only necessary to read the fourth paragraph of Mr. Newell's letter of July 1, 1980 to answer the question of whether or not a settlement was reached. Not only does he indicate that no "meeting of the minds" occurred, but he even candidly admits that he had no authority to make the type of settlement which plaintiff now argues was made.

■ Without the approval of Colonel Harp, Mr. Newell could not have settled this case. The Arkansas statutes quoted above vest in the State Police Director the sole authority to hire personnel, subject to the approval of the State Police Commission. It is an elementary legal principle that an attorney may not settle a case without the express permission of the client. *Harrop v. Western Airlines, Inc.*, 550 F.2d 1143 (9th Cir. 1977); *Thomas v. Colorado Trust Deed Funds, Inc.*, 366 F.2d 136 (10th Cir. 1966). Implied authority to settle a case is not recognized. *Englehardt v. Bell & Howell*, 299 F.2d 480 (8th Cir. 1962).

■ Indeed, it is inconceivable that Mr. Newell would have agreed to a settlement under which an applicant would be hired as a Trooper with the Arkansas State Police without the necessity of some sort of background check. To constitute a binding agreement on parties, there must be a definite proposition and an acceptance, and evidence of mere negotiations is insufficient to prove a compromise. *Russell v. U. S.*, 320 F.2d 920, 924 (Ct. of Claims 1963).

The only definite agreement that counsel reached was that plaintiff would take the revised examination provided in the Consent Decree of Judge Shell. Such agreement was superfluous because the opportunity for Ward to take the revised examination was given in the consent decree. In fact the evidence has shown that Jones and Newell were negotiating in terms of this consent decree, not in terms of the instant litigation.

*There is no case or controversy under Article III of the United States Constitution.* Article III of the Constitution states that the judicial power shall extend only to "cases" or "controversies." "Embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." *Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947 (1968).

*Board of School Commissioners of the City of Indianapolis v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) bears many similarities to the case at bar. It began with a class action complaint under Rule 23, as did the instant case. No effort was made to certify the class.[3] Plaintiffs, who were high school students, claimed that

defendants had interfered with their First and Fourteenth Amendment rights with respect to the publication of a student newspaper. When the case reached the Supreme Court, the plaintiffs had graduated from high school. The Supreme Court dismissed the complaint. "The case is therefore moot unless it was duly certified as a class action pursuant to Fed.Rule Civ.Proc. 23, a controversy still exists between petitioners and the present members of the class, and the issue in controversy is such that it is capable of repetition yet evading review. *Sosna v. Iowa*, 419 U.S. 393 [95 S.Ct. 553, 42 L.Ed.2d 532] (1975)." *Id.* at 129, 95 S.Ct. at 850.

In *Sosna*, plaintiff had filed a class action under Rule 23, asserting that Iowa's durational residency requirement in divorce cases violated the U. S. Constitution on equal protection and due process grounds. The class was duly certified by the Federal District Court. The Supreme Court held that the fact that appellant had long since satisfied the durational residency requirement by the time the case reached the Supreme Court did not moot the case, since the controversy remained alive for the class of unnamed persons whom she represented and who, upon certification of the class action, would have acquired a legal status separate from her asserted interest. The court pointed out that "state officials will undoubtedly continue to enforce the challenged statute and yet, because of the passage of time, no single challenger will remain subject to its restrictions for the period necessary to see such a lawsuit to its conclusion." *Id.* at 400, 95 S.Ct. at 558. While the case was no longer live as to the plaintiff, it was alive for the class of persons she had been certified to represent. The court issued the following *caveat*: "Our conclusion that this case is not moot in no way detracts from the firmly established requirement that the judicial power of Article III courts extends only to 'cases and controversies' specified in that Article. There must not only be a named plaintiff

---

**3.** In the case at bar not only was no effort made to certify the class within the time given by the court for such motion, but plaintiff's

counsel specifically requested that it be removed from the class action calendar.

who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23, but there must be a live controversy at the time this court reviews the case. *SEC v. Medical Committee for Human Rights*, 404 U.S. 403 [92 S.Ct. 577, 30 L.Ed.2d 560] (1972)." *Id.* at 402, 95 S.Ct. at 559. The court noted that the plaintiff "must show that the threat of injury in a case such as this is 'real and immediate', not 'conjectural' or 'hypothetical.'" *Id.* at 403, 95 S.Ct. at 559. The *Sosna* decision was followed in *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) where a class had been certified and issues remained as to the class, even though plaintiff no longer had a personal stake in the litigation.

■ The distinctions between *Sosna* and *Frank* and the instant case are obvious. In the former there were certified classes which were very much affected by the outcome. In *Sosna* the issue could not be satisfactorily litigated because the statutory requirements would always be met when the case came on for appellate review. Here there was no class certified, but even if the class of applicants had been certified, they were fully protected by Judge Shell's decree. As a matter of fact, plaintiff Ward took the revised test required by the consent decree and passed it. That decree not only applied to him and protected him, but he reaped the benefits therefrom.

Like *Board of School Commissioners of the City of Indianapolis v. Jacobs, supra*, the recent case of *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) is strikingly parallel to the case at bar. The respondents represented present and future black and Mexican-American applicants to the Los Angeles Fire Department. In a class action, duly certified, they attacked departmental hiring policies based on a 1972 civil service examination. The court said that "jurisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that "there is no reasonable expectation . . . that the alleged violation will recur, see *Id.* [*U. S. v. W. T. Grant, Co.*, 345 U.S. 629] at 633 [73 S.Ct.

894, 897, 97 L.Ed. 1303], see also *SEC v. Medical Committee For Human Rights*, 404 U.S. 403 [92 S.Ct. 577, 30 L.Ed.2d 560] (1972) and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. See, e. g., *De Funis v. Odegaard*, 416 U.S. 312 [94 S.Ct. 1704, 40 L.Ed.2d 164] (1974); *Indiana Employment Security Division v. Burney*, 409 U.S. 540 [93 S.Ct. 883, 35 L.Ed.2d 62] (1973)." *Id.* at 631, 99 S.Ct. at 1383. The court went on to hold that the first condition was met because there was no reasonable expectation that petitioners would use an invalidated civil service examination for the purposes contemplated in 1972. The second condition of mootness was met since the Department after 1973 had complied with the District Court's decree and their hiring of over 50% of new recruits from minorities has completely cured the discriminatory effects of the 1972 proposal.

In contrast to the case under consideration, *Davis* was a class action. However, in both cases there were court orders involving past discriminatory practices and enjoining future such practices, albeit the order here was issued in a separate lawsuit. As in *Davis*, the proof adduced herein shows that the Department is in compliance with the court order issued by Judge Shell aimed at discriminatory testing and hiring practices. As noted above, plaintiff Ward passed the test validated under Judge Shell's order. If the *Davis* class action was moot, surely Ward's individual action is moot.

Davis relied on *De Funis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) and *Employment Security Division v. Burney*, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973). The former case came on for decision in the same posture as the case at bar. Plaintiff sued as an individual and not on behalf of a class. He claimed discrimination in the admission policy of the University of Washington Law School. When the case came on before the Supreme Court for decision, it was developed on oral argument that plaintiff had in fact been admitted to the law school and was then in his last semester prior to graduation. The case was dismissed for mootness. In *Indi-*

*ana Employment Division v. Burney, supra,* plaintiff attacked Indiana's system of administering unemployment insurance. However, she later secured a reversal of the state agency's initial determination that she was ineligible for benefits and was awarded all her back compensation. The litigation was held to be moot. See also *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) and *Pasadena Bd. of Education v. Spangler,* 427 U.S. 424, 430, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599 (1976).

There have been two Article III decisions in the last term of the Supreme Court. *U. S. Parole Commission v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 and *Deposit Guaranty Bank v. Roper,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427, were decided on March 19, 1980. Geraghty, after being twice denied parole, challenged the U. S. Parole Commission's Release Guidelines. The District Court denied class certification and granted summary judgment for the Commission on the merits. Geraghty was released from prison while his appeal to the Court of Appeals was pending. That court held that the District Court had erroneously refused to certify a class and that the case had not become moot. The Supreme Court agreed that the case was not moot under Article III:

> We therefore hold that an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied. The proposed representative retains a 'personal stake' in obtaining class certification sufficient to assure that Art. III values are not undermined. If the appeal results in reversal of the class certification denial and a class subsequently is properly certified, the merits of the class claim then may be adjudicated pursuant to the holding in *Sosna.*

> Our holding is limited to the appeal of the denial of the class certification motion. A named plaintiff whose claim expires may not continue to press the appeal on the merits until a class has been properly certified. See *Roper,* ante. If, on appeal, it is determined that class certification [was] properly denied, the claim on the

merits must be dismissed as moot. (445 U.S. at p. 404, 100 S.Ct. at p. 1212.)

The last paragraph of the above quotation has particular relevance to the case at bar. Article III mootness was avoided only by the fact that the propriety of the class action was unresolved. If the class is later determined to be improper, then the litigation is moot. Ward not only did not ask for class certification but asked that his case be removed from the class action calendar.

*Deposit National Bank v. Roper, supra* was a class action for usury on credit card transactions. The District Court refused class certification. When plaintiffs unsuccessfully tried to take an interlocutory appeal to the Court of Appeals, the bank then tendered to the named plaintiffs the maximum amount they could have recovered, which plaintiffs refused. Based on the bank's offer, the District Court entered judgment in plaintiff's favor, over their objection, and dismissed the action. The Court of Appeals held that the matter was not moot and reversed the adverse certification ruling. The Supreme Court agreed that the matter was not moot. "A district court's ruling on the certification issue is often the most significant decision rendered in these class-action proceedings. To deny the right to appeal simply because the defendant has sought to 'buy off' the individual private claims of the named plaintiffs would be contrary to sound judicial administration. Requiring multiple plaintiffs to bring separate actions, which effectively could be 'picked off' by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions, moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement." (—— U.S. at p. 339, 100 S.Ct. at 1174.) Obviously this case has no bearing on the case at bar. *Roper* was concerned with maintaining the viability and utility of class actions. These issues were in no sense involved with Ward's individual claim.

To cite further authority in view of the above-noted Supreme Court cases, would appear useless.[4] However, an opinion of this Circuit is noteworthy. In *Jackson v. Wheatley School District No. 28*, 489 F.2d 608 (8th Cir. 1974), it was held that a case involving a racially motivated discharge of a black school teacher was mooted by the reinstatement of the plaintiffs by the school district.

*Cramer v. Virginia Commonwealth University*, 486 F.Supp. 187 (E.D.Va.1980) should be mentioned because of its close factual similarities to this case. Plaintiff claimed sex discrimination at the college where he had been temporarily employed and had sought permanent employment. However, at the time the case came on for trial, the court found that plaintiff had secured better and higher paid employment and actually did not desire the position for which he had previously applied. The case was dismissed as moot. To the same effect see *Flesch v. Eastern Pennsylvania Psychiatric Institute*, 472 F.Supp. 798 (E.D.Pa. 1979).

The fact that plaintiff has asked for attorney fees does not affect the mootness of this case. This problem was dealt with at some length in *Flesch v. Eastern Pennsylvania Psychiatric Institute, supra* :

As I understand her position, plaintiff does not suggest that a controversy *presently* exists over her entitlement to a fee award. Indeed, plaintiff has not sought a fee award for the services rendered to date by her attorneys in this case. *See generally Ross v. Horn*, 598 F.2d 1253 (2d Cir. 1979). Rather she contends that if she litigates this case to its conclusion and obtains a declaration that defendants violated her civil rights, she would *then* be entitled to a fee award for all services rendered by her attorneys in connection with this case. See 42 U.S.C. § 2000e–5(k) (1976) (court may award prevailing party "a reasonable attorney's fee as part of the costs"). That may well be true, but it is no answer to the mootness problem. A litigant's desire to obtain a fee award at the conclusion of a case cannot keep the case in federal court after it has become moot in all other respects. *Cf. Bank of Marin v. England*, 385 U.S. 99, 111 n. 1, 87 S.Ct. 274, 281 n. 1, 17 L.Ed.2d 197 (1966) (Fortas, J., dissenting) ("controversy as to costs alone does not salvage an otherwise moot case"); *Heitmuller v. Stokes*, 256 U.S. 359, 361–62, 41 S.Ct. 522, 65 L.Ed. 990 (1921) (same). Any other rule would largely nullify the mootness doctrine with respect to cases brought under the myriad federal statutes that authorize fee awards. See *generally Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260–61 n. 33, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (col-

---

4. Other Supreme Court decisions dealing with the "case or controversy" requirement of Article III are as follows: *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969); *U. S. v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1961); *Sibron v. N. Y.*, 392 U.S. 40, 50 n. 8, 88 S.Ct. 1889, 1896 n. 8, 20 L.Ed.2d 917 (1968); *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977); *Kremens v. Bartley*, 431 U.S. 119, 129–30, 97 S.Ct. 1709, 1715, 52 L.Ed.2d 184 (1977); *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975);

*Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 633 (1962); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 1601 (1979); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 260–61, 97 S.Ct. 555, 560–61, 50 L.Ed.2d 450 (1977); *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *S. v. D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976); *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975); *Baxter v. Palmigiano*, 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 1554, 47 L.Ed.2d 810 (1976); *Ashcroft v. Mattis*, 431 U.S. 171, 172–73, 97 S.Ct. 1739, 1740, 52 L.Ed.2d 219 (1977).

lecting statutes). Thus, plaintiff's argument cannot succeed.

Indeed, plaintiff is not entitled to an attorney's fee in this case because he was not the prevailing party. 42 U.S.C. § 2000e–5(k). "The standards by which to assess a party's entitlement to such an award have been set forth in this Circuit in *Bonnes,* supra. (*Bonnes v. Long,* 599 F.2d 1316 (4th Cir. 1979). *Under those tests, a plaintiff cannot be a prevailing party when his claim is dismissed as moot.*" *Cramer v. Virginia Commonwealth University,* 486 F.Supp. 187, 192 n. 7 (E.D.Va.1980). (Emphasis added.)

On the basis of the authorities cited and discussed above, this case is clearly moot. The plaintiff voluntarily abandoned all attempts to seek employment with the Arkansas State Police and entered the U. S. Army. He was advised that an interview was an integral part of the employment process yet he never made himself available for interview at the requisite time. Abandonment of his attempt to seek employment also completely negates any claim for back pay. The consent decree entered by Judge Shell deals specifically with entitlement for back pay. It provides back pay only to those "subsequently hired" and sets up a schedule by dates and amounts.

■ *Collateral Estoppel.* Even if this case were not moot under Article III, it appears that plaintiff faces an insurmountable obstacle to relief on his complaint because of collateral estoppel. The following relief was prayed:

A. Grant plaintiff a declaratory judgment that the actions of the defendant complained of herein violate the rights of plaintiff guaranteed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*

B. Grant plaintiff a permanent injunction prohibiting the defendant from engaging in the policies and practices complained of herein in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*

C. Grant plaintiff and the class represented by plaintiff, job transfers, promotions, back pay and front pay as are necessary, just and proper.

D. Order the elimination of current seniority practices, tests, age, education and any other requirements which are not job related and which operate to discriminate against plaintiff and the class represented by plaintiff.

E. Order defendant to institute an affirmative action program which operates to recruit blacks in all positions and which will insure fair and equal treatment to all black employees.

F. Award plaintiff the costs of this action together with reasonable attorneys' fees as provided by 42 U.S.C. § 2000(e)–6[5](k).

G. Order the institution of revised job assignment practices which will redress defendant's past discrimination against the plaintiff class and ensure that it does not recur in the future.

H. Grant plaintiff such other relief as may be necessary and proper for complete relief.

If these paragraphs are examined, it will be observed that all the relief sought was granted to State Police applicants in Judge Shell's consent decree of February 1, 1978.[5] The only relief sought which is not specifically covered by Judge Shell is for back pay and attorney fees. Plaintiff is clearly entitled to neither, as pointed out above. It is indisputable that plaintiff was a member of the class to which the decree was directed. It was for the benefit of individuals in plaintiff's situation that the United States filed the litigation and secured the consent decree in the United States District Court. "A valid consent judgment or decree based upon a compromise and settlement precludes the parties and their privies from relitigating an issue involved therein." *U. S. v. Stinnett,* 318 F.Supp. 1337 (W.D.Okl. 1970). In respect to the doctrine of collateral estoppel, the following comment in *Raitport v. Commercial Banks,* 391 F.Supp. 584 (S.D.N.Y.1975) is pertinent: "The critical factor to be determined is whether the issues raised in the action were actually

**5.** See Footnote 1.

litigated and determined in the prior action." The Supreme Court has recognized the doctrine of collateral estoppel. "It is clear that judicial decisions have tended to depart from the rigid requirements of mutuality. In accordance with this trend, there has been a corresponding development of the lower courts' ability and facility in dealing with questions of when it is appropriate and fair to impose an estoppel against a party who has already litigated an issue once and lost." *Blonder-Tongue Laboratories, Inc. v. University of Illinois*, 402 U.S. 313, 349, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971). Here the plaintiff was a class beneficiary of litigation which the United States initiated on his behalf and won. Even if the issues were not moot, he should not be permitted to relitigate them. His recourse would be to demonstrate that the State Police are violating Judge Shell's decree. This case is not the proper vehicle to demonstrate noncompliance with Judge Shell's decree, even if we postulate that noncompliance exists. Certainly, as to this plaintiff, no such noncompliance has been demonstrated.

In conformity with the findings of fact and conclusions of law set forth above, the plaintiff's complaint is hereby dismissed.[6]

---

**6.** This case could well have been dismissed because of the noncompliance of plaintiff's attorneys with orders of the Court. Fed.R.Civ.P. 41(b). After the conference requested by Mr. Walker and held June 24, 1980, the attorneys were directed by letter dated June 30, 1980 to submit proposed findings of fact and conclusions of law five days before the matter was set for trial. This was not done by plaintiff's attorneys. At the end of the hearing held on July 16, 1980, the attorneys were directed to submit briefs by July 23, 1980 on Article III and collateral estoppel issues, which had begun to trouble the Court after hearing the testimony. No brief at all has been submitted by plaintiff's counsel. Failure of counsel to comply with directions of the Court, particularly with regard to briefing, imposes an additional heavy load on judges and their staffs engaged in trying to handle a calendar of several hundred cases.